
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

HAYLEY GIEZEY,

Plaintiff,

v.                                                                                    4:09CV143

MICHAEL J. ASTRUE, COMMISSIONER,
Social Security Administration,

Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Hayley Giezey ("Giezey" or "plaintiff") brought this action under 42 U.S.C. §§ 1383(c)(3) and 405(g) seeking judicial review of the Commissioner of the Social Security Administration ("Commissioner") decision denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act. By order filed December 30, 2009, this action was referred to a United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, the Court recommends that the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL BACKGROUND

On February 28, 2007, Giezey filed an application for DIB and SSI, alleging disability beginning December 20, 2005, due to bipolar disorder, asthma, chronic obstructive pulmonary

disease ("COPD"), and a shoulder injury. (R.[1] 67-70). The Commissioner denied her application initially, (R. 71-80), and upon reconsideration. (R. 84-93). Giezey made a timely request for an administrative hearing, (R. 94-5), which was conducted on April 7, 2009, (R. 20-53).

On May 14, 2009, Administrative Law Judge ("ALJ") William T. Vest, Jr. found that plaintiff was not disabled within the meaning of the Social Security Act, and denied her claim for DIB and SSI. (R. 6-19). On August 21, 2009, the Appeals Council denied review of the ALJ's decision, (R. 1-3), thereby making the ALJ's decision the final decision of the Commissioner.

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), on October 20, 2009, Giezey filed this action seeking judicial review of the Commissioner's final decision. This case is now before the Court to resolve the parties' cross-motions for summary judgment.

## II. FACTUAL BACKGROUND

Giezey was born on November 5, 1976, and was twenty-nine years old at the time of the alleged onset of disability. (R. 23). Giezey testified that she is 5'2" and weighs 135 pounds. (R. 28). She has a GED, completed two years of college, (R. 23), and in 2004 she earned an associate's degree from the Medical Careers Institute, (R. 315). She has been employed as a food service cashier, a retail cashier, a customer service representative, and as a home health care aide. (R. 23). Giezey was employed at her last job as a retail clerk from November 2007 to January 2008. (R. 25). She testified that her employment ended because she could not lift the merchandise – which she estimated weighed 75 lbs. She also stated that she had difficulty breathing due to "the chemicals they wanted us to use". (R. 26).

---

[1] "R." refers to the compiled Administrative Record.

2

On December 20, 2005, Giezey was admitted to Riverside Behavioral Health Center on a temporary detention order, after overdosing on twenty-four Xanax pills in a suicide attempt. (R. 16, 433-43). Giezey was kept in the hospital because of angry outbursts directed at her attending physician, Dr. Kohazi. (R. 433). During her admission, Dr. Kohazi assessed her with a Global Assessment of Functioning (GAF) of 30 – 35.[2] (R. 437). She was released on December 24, 2005. (R. 433). Upon discharge, her attending physician noted that she "had no significant suicidal thoughts" during her admission, but "kept getting angry with her dealings with Dr. Kohazi." He assessed her with a Global Assessment of Functioning ("GAF") of 65.[3] (R. 433).

On December 26, 2006, Giezey returned to the hospital complaining of shoulder pain connected to restraints used during her inpatient admission. She was diagnosed with a muscle strain and released. (R. 334-36).

On July 7, 2006, Giezey presented to the Riverside Regional Medical Center emergency room with complaints of migraine headaches and vomiting. (R 320-21). A CT scan of plaintiff's head was performed and returned normal results. (R. 323). Giezey was prescribed Floricet to treat the migraines, (R. 324), which she continued to take at the time of the hearing, (R. 36).

---

[2]The GAF scale is a numeric scale (0 through 100) used for reporting the clinician's judgment of an individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning. A GAF score in the 30 – 35 range indicates that during her hospitalization she had major impairments in several areas such as work, school, family relations, judgment, thinking or mood. *Diagnostic and Statistical Manual of Mental Disorders Text Revision* pp. 32-4 (4th ed. 2000).

[3] A GAF score in the 61 – 70 range indicates that her clinician believed Giezey suffered some mild symptoms and had some difficulty in social and occupational functioning, but that she generally functioned reasonably well and was able to have some meaningful interpersonal relationships. *DSM-IV-TR* p. 34.

3

On October 3, 2006, Giezey met with an orthopaedic surgeon, Dr. Loel Payne, complaining of left shoulder pain, which she still related to being restrained in the emergency room in December of 2005. (R. 535). Dr. Payne initially tried an injection into the glenohumeral joint, (R. 534), but this procedure failed to relieve the symptoms, (R. 533). On November 15, 2006, she underwent arthroscopic surgery to repair a type II SLAP[4] tear in her left shoulder. (R. 473, 530). Giezey attended eleven post-operative physical therapy sessions, the last of which occurred on January 8, 2007. (R. 465-72). At that time, Dr. Payne noted that Giezey had been recovering well until she fell in early January 2007. (523-24). Dr. Payne ordered an MRI which showed a probable recurrent tear of the SLAP lesion. (R. 513, 21).

On June 20, 2007, Giezey underwent a second left shoulder arthroscopic SLAP tear repair. (R. 514). One month after this surgery Dr. Payne reported that Giezey's recovery from the second SLAP repair was "better than the first." He noted she could "actively flex 120°", and discontinued her sling. (R. 509). On September 11, 2007, Dr. Payne noted that although Giezey still noted shoulder pain, she had "almost full flexision . . . no crepitus . . . and strength is 4/5." (R. 508). These are the last treatment notes in the Administrative Record from Giezey's treating orthopaedist concerning her shoulder surgery.

In addition to specialists, Giezey regularly saw her primary caregivers at Riverside Family Practice. Beginning approximately two years before the hearing, her regular provider was Dr. Bercasio.

---

[4] SLAP is an acronym for "Superior Labral tear from Anterior to Posterior" and describes a tear in the labrum, which is a ring of cartilage surrounding the shoulder socket. Orthopaedic Specialists, Patient Guide to SLAP Tears, Bryn Mawr Sports Medicine, 1, http://www.orthspec.com/pdfs/SLAP.pdf.

On January 2, 2007, Giezey presented to Dr. Bercasio complaining of back pain, a cough and shortness of breath. (R. 494). Giezey underwent pulmonary testing, which showed a mild obstruction. (R. 496). A lumbar spine procedure was also performed on January 3, 2007, which diagnosed her with mild right sacroiliitis. (R. 506).

On March 14, 2007, Giezey again presented to Port Warwick Family Practice with complaints of intermittent right upper quadrant abdominal pain and a recheck of her breathing problems. As relevant here, Dr. Bercasio's assessment on that date concluded that Giezey suffered from COPD/asthma; chronic tobacco abuse; chronic migraines; and a right shoulder labrum tear. Dr. Bercasio also noted her diagnosis of bipolar which he described as "stable". He prescribed testing for her abdominal pain, medications for asthma and counseled her to stop smoking.[5] Pulmonary testing again showed that plaintiff had a moderate obstruction, but cautioned that the results could be compromised because only one acceptable maneuver was performed. (R. 493).

On March 22, 2007, Giezey presented to the Sentara CarePlex with asthma/COPD symptoms. (R. 458). During a follow-up visit with Dr. Bercasio's office on March 26, 2007, two additional pulmonary tests were performed – however, the first test's results could have been skewed because the maneuver was not "reproducible." (R. 490). The second pulmonary test indicated a moderate obstruction. (R. 491).

---

[5] The medical records reflect that Giezey was counseled to quit smoking as early as 1998, when she presented with breathing problems. Her treating physician discussed the importance of quitting smoking and recorded that "patient has no plan at this time" to do so. (R. 291).

Giezey again presented to the Sentara CarePlex emergency room on April 1, 2007, and was diagnosed with acute bronchitis, asthma, and dyspnea.[6] (R. 451). The next day, Giezey presented to Dr. Bercasio at the Port Warwick Family Practice again in follow-up to her emergency room visit. At this time, Dr. Bercasio diagnosed her with having exacerbated her COPD and asthma. (R. 487). He again counseled her to quit smoking, and recorded that she was "committed to quit smoking at this time." He recorded his review of systems as follows: stable weight, good appetite, no headache, or dizziness, no chest pain. She has ongoing exertional shortness of breath. (R. 487).

On April 25, 2007, a follow-up pulmonary test was performed, which indicated Giezey had moderate obstruction. (R. 486). At that time, Dr. Bercasio noted that the prescribed medications (steroids) had greatly improved her symptoms, but that Giezey "continues to smoke," and had yet to fill the prescription for smoking cessation medication he prescribed. (R. 484). At the conclusion of the April 25, 2007 visit Dr. Bercasio noted her diagnoses "COPD exacerbation, much improved; Chronic tobacco abuse; Right shoulder labral tear; Recent sunburn, improved; History of migraines, History of bipolar illness, stable." He again re-emphasized that Giezey should stop smoking. (R. 484).

On May 31, 2007, Giezey presented to Dr. Bercasio with a migraine headache, shortness of breath, cough, and wheezy breathing. (R. 480). She continued to smoke.

On August 24, 2007, Giezey saw Dr. Bercasio again, complaining of shortness of breath. At that time he noted that she "continue[d] to smoke one pack of cigarettes a day." (R. 477).

---

[6] Dyspnea is defined as shortness of breath, breathlessness, and difficult or labored respiration. *Dorland's Illustrated Medical Dictionary* 589 (31st ed. 2007).

She refused to see the pulmonary specialist Dr. Bercasio previously consulted and requested a referral to another provider. Dr. Bercasio noted the difficulty of getting another specialist who accepted her insurance coverage. (R. 477). He also noted that she would not take medication for her bipolar condition, as she blamed the medication for her past suicidal thoughts. However, Dr. Bercasio also noted at the time that her bipolar has "been stable with this" thus far. (R. 477).

Dr. Bercasio saw Giezey again on November 13, 2007. On that date, she sought treatment for "right wrist pain these past few weeks." Dr. Bercasio noted "no recent injury although does a lot of computer typing." (R. 552). Giezey also complained of abdominal symptoms and sought follow up for her underlying COPD. In this regard, Dr. Bercasio noted that she had seen a specialist "for nonallergic asthma with likely small component of COPD and is presently doing well with Symbicort." (R. 552). He also observed that "she has yet to start Chantix for smoking cessation." (R. 552). He described his review of symptoms as "Chronic exertional dyspnea, but improved. No audible wheezing." (R. 552). He recommended that she continue all of her present medication and "again emphasized to stop smoking and to initiate Chantix." (R. 552-553).

On January 1, 2008, Dr. Bercasio's notes reflect a telephone inquiry from Giezey requesting "a second opinion for shoulder – she has been seeing Dr. Payne." The records do not reveal whether Giezey received any further treatment for her shoulder after this request. This was the last contact Giezey had with Dr. Bercasio prior to his physical capacities evaluation at issue in this case.

In his physical capacities evaluation of plaintiff on February 5, 2008. (R. 255-58). Dr. Bercasio opined that Giezey could only walk for a maximum of forty minutes without rest, could

7

never lift more than five pounds (and lift five pounds only occasionally), and that it would be medically necessary for her to lie down during a normal eight-hour workday. (R. 256-58). Dr. Bercasio concluded that Giezey did not have the physical capacities to perform even sedentary work. (R. 258). The evaluation contains no specific clinical findings, however, his notes from the office visit conducted the same day reflect only that her neck and musculoskeletal exams were "normal" but she had decreased range of motion in her left shoulder. Dr. Bercasio's notes on Giezey's respiratory function indicated "wheezes" and "diminished" breath sounds. As near as the Court can decipher the handwritten notes, his assessment was "chronic COPD/asthma, tobacco abuse, chronic L shoulder (illegible) and bipolar depression – stable." (R. 545).

On April 7, 2008, Dr. Bercasio saw Giezey again. This time for complaints of hand pain related to IVs inserted during a recent hysterectomy. Although the visit did not include a detailed physical exam, the notes in the Administrative Record reflect that her musculoskeletal condition was "normal."

On October 16, 2008, Dr. Bercasio saw Giezey for a variety of complaints. On that day, he recorded that Giezey complained of back pain, a possible urinary tract infection, pressure in her lower abdomen and follow up of her COPD/asthma. (R. 538). Dr. Bercasio conducted a detailed physical exam on that date, which showed that she was "alert and oriented" with a normal gait. She had normal range of motion with no swelling or tenderness. Her neck was supple with a normal range of motion. Her breath sounds were normal with no wheezes and no rales. With regard to her psychiatric condition, Dr. Bercasio noted that her affect was normal. (R. 538).

At the time of the hearing, Dr. Bercasio had treated Giezey for over two years, (Plaintiff's Brief, 4), and she first visited his office on September 27, 2006. (R. 499). Giezey's medical records introduced at the hearing indicate that the vast majority of her appointments dealt with her respiratory problems and migraine headaches, for which Dr. Bercasio prescribed medication and repeatedly counseled her to stop smoking. (R. 477-8, 480-2, 484, 487, 492). Additionally, Dr. Bercasio would refer Giezey to specialists depending on her specific symptoms, including: gynecologists, (R. 478), pulmonalogists, (R. 477), allergists, (R. 477), and gastrointestinologists, (R. 485). None of the test results performed by the specialists or Dr. Bercasio himself (including pulmonary function tests, thyroid tests, gallbladder tests, an abdominal ultrasound, and CT scan) indicated any serious health problems. (R. 363, 479, 486, 490-1, 493, 496, 501-4).

In connection with the application for benefits, Edward H. Spain, Ph.D., a licensed clinical psychologist, evaluated plaintiff on July 6, 2007. (R. 314). Dr. Spain noted that Giezey's problems with bipolar mood swings began in her early school years, (R. 314), and that she first began intermittent treatment in the fourth grade, (R. 316). Giezey informed Dr. Spain that she had been hospitalized two times during periods of suicidality (2002 and 2005), and made several suicide attempts by overdosing on prescription medication. (R. 316). Dr. Spain also recorded that Giezey had not received treatment for her psychological difficulties since February of 2006. (R. 316).

Dr. Spain observed that Giezey came to the appointment dressed and groomed appropriately, and was generally cooperative and respectful during the evaluation. (R. 317). Dr. Spain noted that Giezey did exhibit evidence of increased psychomotor activity, and that her affect was mildly constricted, particularly noting that she appeared anxious and depressed. (R.

317). The content of her speech was consistent with her affect during the session, and her speech was rapid, though adequately organized. (R. 317). Dr. Spain noted that the content of her thoughts fell within normal nonpsychopathological limits, and Giezey seemed to be aware of her surroundings and was alert. (R. 317). Giezey's ability to pay attention was assessed to be an area of considerable difficulty, but was still adequate. (R. 317). Finally, Dr. Spain noted that her intelligence appeared to fall within the average range, and that her social judgment was mildly impaired in response to standard questioning. (R. 317).

Dr. Spain diagnosed Giezey with bipolar disorder, and noted a prior diagnosis of a personality disorder. (R. 318). He assessed plaintiff with a current GAF of 50.[7] (R. 318). In his prognosis, Dr. Spain opined that with access to help, future improvements in Giezey's emotional functioning is guarded to good; however, the likelihood of relapse for bipolar mood swings is moderate to high. (R. 319). Based on his observations, Dr. Spain indicated that Giezey is able to perform simple and repetitive tasks without special supervision or assistance, and could comprehend simple directions from a supervisor. (R. 319). However, he also stated that Giezey's mood swings would significantly interfere with her ability to work a normal shift, and "in the long run", those mood swings would render her unable to behave appropriately with supervisors, colleagues, or the general public. (R. 319).

On August 9, 2007, Robert Gerstle, Ph.D., a state agency psychologist, reviewed Giezey's claims for benefits and her medical records, including Dr. Spain's notes. (R. 221-35). After examining Giezey's record, Dr. Gerstle also diagnosed Giezey as suffering from bipolar disorder,

---

[7] A GAF score in the 41-50 range indicates serious symptoms, including suicidal ideation, or serious impairments in social, occupational or school functioning. A range of 61-60 indicates moderate symptoms and moderate difficulties. *DSM-IV-TR*, 34.

(R. 224), and a "not-otherwise-specified" personality disorder. (R. 228). Dr. Gerstle indicated that Giezey had a mild restriction of daily activities, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. (R. 232). Dr. Gerstle disagreed with Dr. Spain's assessment that Giezey's mood swings would eventually interfere with her ability to work and behave appropriately, stating such a finding was unsupported by the medical and non-medical evidence. (R. 239). Dr. Gerstle concluded that Giezey was capable of performing simple, routine tasks in employment. (R. 239).

In August of 2007, Richard Surrcusco, M.D., a state agency physician, performed a review of plaintiff's claim for benefits. (R. 240-46). After reviewing Giezey's record, Dr. Surrcusco opined that despite plaintiff's claims to the contrary, her physical impairments did not wholly limit her ability to work. (R. 241-45). According to Dr. Surrcusco, Giezey's only postural limitation was that she should never climb, (R. 242), and her only manipulative limitation was the ability to reach in all directions. (R. 242). Specifically, Dr. Surrcusco assessed that Giezey could occasionally lift twenty pounds, frequently lift ten pounds, stand/walk for six hours in an eight-hour workday, and perform limited push/pull maneuvers involving her upper extremities. (R. 241). A second state agency physician, Martin Cader, M.D., also reviewed the medical records and concurred with Dr. Surrcusco's conclusions. (R. 247).

Robert Edwards was called to testify as an impartial vocational expert ("VE") during the hearing. Edwards classified Giezey's past relevant work accordingly: fast food cashier as light, unskilled work; retail cashier as medium, semiskilled work; home health aide as medium, semiskilled work; and customer service clerk as light and semiskilled. (R. 48-9). In response to a hypothetical framed by the ALJ, Edwards testified that jobs were available in the local and

11

national economy for an individual with Giezey's age, education, and work experience who was limited to light work, who could lift and carry five pounds occasionally with the left dominant arm (with no reaching overhead), who could walk or stand for six hours in an eight hour day with an opportunity to alternate sitting and standing at will, and who was limited to low-stress, simple, repetitive tasks without frequent interaction with the general public. (R. 49). Edwards identified light, unskilled work such as unarmed security guard (620 locally/125,000 nationally), and office clerk/helper (1,350 locally/265,000 nationally). (R. 49-50). Edwards also identified sedentary, unskilled work such as gate guard (470 locally, 94,000 nationally), and surveillance system monitor (550 locally, 112,000 nationally). Giezey's attorney asked to amend the hypothetical to add plaintiff's asserted mental health impairment which makes her unable "to behave in a socially appropriate way with supervisors, coworkers, or with the general public on a regular basis." (R. 50-1). The VE testified that such an individual would be precluded from working. (R. 51).

At the hearing before the ALJ, Giezey testified that her greatest impediment in finding and sustaining suitable employment was her bipolar disorder and her left shoulder/arm pain. (R. 38). According to Giezey, she is unable to perform housework, has difficulty bearing weight and performing overhead maneuvers with her left dominant arm. She testified she is unable to walk for more than five minutes without resting, has severe mood swings, and difficulty in social situations. (R. 30-1, 34, 38, 44). Giezey testified that she does not currently take antidepressants or the medication for her bipolar disorder prescribed by her physician, (R. 39-40), because she is afraid of their side effects, (R. 40). Giezey also testified that she is currently taking over-the-counter pain medication for her left shoulder. (R. 30). Plaintiff also takes prescription medication

for migraine relief, (R. 36), Chantix for smoking cessation, (R. 34), prescription medication for her COPD/asthma, and uses a nebulizer twice a day, (R. 35).

## III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2008); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hayes, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

13

## IV. ANALYSIS

To qualify for a period of disability and DIB under sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined by the Act.

To become eligible for SSI payments under Title XVI of the Act, the claimant, in addition to satisfying the income and resource requirement in 42 U.S.C. § 1382(a) and 42 U.S.C. § 1382(b), must also satisfy the basic eligibility and definitional requirements for disability found in 42 U.S.C. § 1381(a) and 42 U.S.C. § 1382(c). The Social Security Regulations define "disability" as the:

> inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

14

1.  Is the individual involved in substantial gainful activity?

2.  Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do work activities?

3.  Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4.  Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5.  Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

"When proceeding through this five step analysis, the ALJ must consider the objective medical facts, the diagnoses or medical opinions based on these facts, the subjective evidence of pain and disability, and the claimant's educational background, age, and work experience." Schnetzler v. Astrue, 533 F.Supp.2d 272, 286 (E.D.N.Y. 2008). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

## A. ALJ's Decision

The ALJ made the following findings under the five-part analysis: (1) Giezey has not engaged in substantial gainful activity since December 20, 2005 (the alleged onset date of disability)[8]; (2) she has severe impairments of COPD/asthma, bipolar disorder, personality disorder, and left shoulder/hand injuries[9]; (3) her impairments (or combination of impairments) do not meet or medically equal one of the listed impairments in Appendix 1; (4) Giezey is unable to perform past relevant work, but has the RFC to perform a limited range of light work that involves a "good deal" of walking and standing and frequently lifting objects weighing up to ten pounds (but never more than twenty pounds); and (5) there are jobs that exist in significant numbers in the national economy that Giezey can perform. (R. 12-18).

In her motion for summary judgment, Giezey alleges the following specific errors: (1) the ALJ failed to give "controlling weight" to the opinion of Giezey's treating physicians; and (2) the ALJ improperly used Giezey's lack of treatment to discount the extent and effect of her mental health limitations. The Court will address each of these arguments in turn.

## B. The ALJ Properly Evaluated the Opinions of Plaintiff's Treating Physician

Upon reaching the fourth step in the sequential analysis, the ALJ must determine the plaintiff's RFC, which is the plaintiff's maximum ability to work despite her impairments. 20

---

[8]The ALJ noted that plaintiff did work after the alleged onset of disability (earning $86.86 in 2006 and $2,662.92 in 2007), however, the work activity did not rise to the level of substantial gainful activity. (R. 12).

[9] The ALJ addressed Giezey's alleged severe migraine headaches and history of substance abuse, but found that "these impairments do not currently impose significant limits on the claimant's ability to perform work." (R. 13). In her motion for summary judgment Giezey has not argued that this finding was in error, and the Court's review indicates substantial evidence supports this conclusion.

C.F.R. §§ 404.1520(e) and 416.945(a)(1). The ALJ then uses that RFC to determine whether the plaintiff can perform her past relevant work. Id. at § 416.945(a)(5)(i). The ALJ's finding of RFC must be based on consideration of all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1545(a)(3) and 416.945(a)(1).[10]

The ALJ found that Giezey has the RFC to perform light work involving lifting and carrying twenty pounds occasionally and ten pounds frequently with her right arm, lifting and carrying five pounds with the left dominant arm with no overhead reaching, sitting for eight hours, and standing or walking for six hours in an eight-hour day, with the option to alternate between sitting and standing as needed. (R. 14). The ALJ also found that due to her mental impairment, Giezey may only perform simple, repetitive tasks that do not require frequent interaction with the general public. (R. 14).

Giezey contends that the ALJ erred by assigning "no weight" to Dr. Spain's consultative opinion, and "minimal weight" to Dr. Bercasio's opinion that she could not work. (R. 16-17). According to Giezey, Dr. Spain's testimony is that her bipolar mood swings would eventually interfere significantly with her ability to work. Similarly, Dr. Bercasio's report stated that plaintiff's physical limitations rendered her completely disabled. Giezey argues the ALJ erred in declining to accord "controlling weight" to the opinion of these two physicians.

---

[10] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

In making an RFC finding, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In deciding the weight to assign to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistence with the record; and (5) the specialization of the physician. Id. at §§ 416.927(d)(2)-(6) and 404.1527(d). After reviewing the entire record and the ALJ's written opinion, the Court believes the ALJ properly evaluated the medical source opinions.

Under the federal regulations and case law, a treating physician's opinion merits "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. at § 416.927(d)(2); see Craig, 76 F.3d at 590. "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590. When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision. 20 C.F.R. § 416.927(d)(2).

Contrary to Giezey's contention, the ALJ did not assign Dr. Spain's opinion "no weight." In fact, the ALJ adopted Dr. Spain's recommendation that Giezey was mentally and emotionally capable of maintaining regular attendance in the workplace and performing simple and repetitive tasks. (R. 16). He also accepted Dr. Spain's conclusion that Giezey's bipolar disorder constituted a severe impairment which limited her ability to work. (R. 12). The ALJ did not accept Dr. Spain's comment that "[i]n the long run..." plaintiff would likely act inappropriately and suffer

18

episodes of emotional deterioration from the stress encountered in a normal workplace. (R. 16, 319). According to the ALJ, Dr. Spain's assessment on this point was not supported by the overall evidence. In particular he noted that "[t]he claimant was well spoken and in no distress at the hearing. Moreover, she is not in psychiatric counseling and does not take antidepressant medication. Moreover, she has not required any recent inpatient hospitalization." (R. 16).

In addition to Dr. Spain's consultative report, Dr. Robert Gerstle performed a psychiatric review of Giezey's medical record, including Dr. Spain's evaluation. (R. 220-39). Dr. Gerstle agreed that Giezey exhibited some moderate limitations which could impact her ability to work, follow detailed instructions, maintain regular attendance, interact appropriately with co-workers, and complete a normal workday and workweek. (R. 236-37). However, Dr. Gerstle did not adopt Dr. Spain's statement concerning Giezey's susceptibility to emotional deterioration "in the long run." Dr. Gerstle concluded that this statement was not supported by the medical or non-medical evidence. (R. 239).

When evaluating the opinion of Dr. Spain, as a consulting psychologist, the ALJ noted that he only evaluated Giezey once. (R. 16). Nothing in Dr. Spain's notes reflected observations or clinical findings resulting from his examination that would support his restrictive view of Giezey's abilities. (R. 239). Dr. Spain's only observation that could help support a finding that Giezey would likely suffer bouts of emotional deterioration was that her affect during the session was "mildly constricted – anxious, easily perplexed and distressed." (R. 317). This observation regarding Giezey's affect is balanced against Dr. Spain's other observations – that she arrived early to the appointment (driving "herself through 12 miles of city traffic"), cooperated throughout the session, and tested within normal limits on all mental status questions. (R. 317-

18). During the hearing, the ALJ also observed an inconsistency between Dr. Spain's conclusion and Giezey's actual demeanor, noting that she appeared both calm and articulate throughout her testimony. (R. 16). The ALJ also noted that Giezey's bipolar disorder was not being treated with counseling or medication, and that she has not required inpatient hospitalization since 2005. (R. 16). Moreover, repeated references in the medical records indicate her bipolar was "stable". (R. 484, 477, 438 "Psychiatric Affect Normal"). Unlike Dr. Bercasio, Dr. Spain was not a treating physician. Without contemporaneous records supporting his more severe diagnosis, the ALJ's failure to adopt this portion of Dr. Spain's opinion and rely upon the other consulting physician, Dr. Gerstle, was not error.

The ALJ also accorded "minimal weight" to Dr. Bercasio's conclusions set forth in his 2008 RFC evaluation. In this report, prepared specifically for her disability application, Dr. Bercasio asserted that plaintiff suffers severe dyspnea with light exercise and could only walk forty minutes[11] without rest, and that chronic left shoulder pain left her able to lift five pounds only occasionally. (R. 17). The ALJ noted that "[a]lthough Dr. Bercasio opines that the claimant does not retain the capacity for even sedentary exertion, this opinion is inconsistent with the overall evidence of the record and has been afforded minimal weight." (R. 17). After reviewing plaintiff's medical records from Port Warwick Family Practice, (R. 477-506), there appear to be few clinical observations which could support Dr. Bercasio's restrictive assessment of Giezey's RFC. According to his "review of symptoms," Dr. Bercasio noted that Giezey suffered only

---

[11] The ALJ's opinion contained a scriveners error when repeating Dr. Bercasio's opinion that Giezey could walk "for four minutes" without rest. (R. 17). In reality, Dr. Bercasio's evaluation states she could continuously walk for forty minutes. (R. 256).

intermittent headaches, exertional shortness of breath, and mild exertional dyspnea. (R. 477, 484, 492). With regard to her shoulder pain, the ALJ noted that after her second surgery, Giezey's orthopaedist reported she had almost full flexion in her left shoulder. (R. 17). The record cited by the ALJ also indicates that her orthopaedist believed her recovery from the second surgery was better than the first with no crepitus and 4/5 strength. Dr. Bercasio's medical records contain no objective clinical or diagnostic test results which would rebut this conclusion. On the date of his physical capacities evaluation he simply noted reduced range of motion in the left shoulder.

As far as her breathing problems, the ALJ noted that "pulmonary function studies confirm only mild obstructive lung disease." (R. 17). Most of Dr. Bercasio's treatment notes also reflect the condition was not totally disabling. In a visit in November, 2007, Dr. Bercasio described her breathing condition as non-allergic asthma with likely small component COPD and found she was "doing well with Symbicort." (R. 552). On October 16, 2008, the last visit for which notes are available, Dr. Bercasio assessed her breathing as normal, with "no wheezes" and "no rales." (R. 537).

In examining the entire record before him, the ALJ determined that it did not support a conclusion that plaintiff is precluded from all work activity. In particular, the ALJ noted:

> She reports fairly extensive activities of daily living wherein she is able to drive, go to baseball games with her children, prepare simple meals, do minor cleaning and maintain her personal care without assistance. In addition, she takes only over-the-counter medication as needed for alleged shoulder pain . . . . Moreover, while pulmonary function studies confirm mild obstructive lung disease, there is no evidence to support that asthma seriously impacts the claimant's ability to move about. There is no evidence to support worsening of symptoms and no indication of adverse medical side effects, which would impair her ability to work, particularly to the degree alleged.

21

(R. 17-18). Having reviewed the ALJ's report, and his description of the medical records before him, the Court finds that the ALJ correctly applied the regulations in determining what weight to assign to Dr. Spain's and Dr. Bercasio's opinions, and his decision is supported by substantial evidence. The ALJ supplied "good reasons" for not giving "controlling weight" to Dr. Bercasio's opinion. Dr. Bercasio's opinion is contradicted by other evidence in the record and the ALJ did not err by refusing to give his opinion controlling weight. Jones v. Sullivan, 954 F.2d 125, 128-29 (3d Cir. 1991).

## C. The ALJ Properly Assessed Giezey's Credibility

Also in step four of the analysis, the ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 16). Giezey contends that, in considering the extent and effect of her mental health limitations, the ALJ erred by improperly using her lack of treatment as evidence of only slight impairment.

Once a claimant has received a written diagnosis of mental illness, those mental impairments, considered singularly and in combination, must be assessed according to the "paragraph B" criteria. The limitations identified by these criteria are not used to determine RFC, but rather to rate the severity of plaintiff's mental impairments. (R. 14). To satisfy the "paragraph B" criteria, the mental impairment in question must result in at least two of the following: (1)

marked restriction[12] of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, and pace; or (4) repeated episodes of decompensation, each of extended period[13]. (R. 13).

The ALJ found that Giezey was only mildly restricted in activities of daily life, as she is able to able to take care of her personal needs, prepare simple meals, and perform some chores around the house. (R. 13). In social functioning, the ALJ determined the Giezey has moderate difficulties, and noted that no evidence claimed she was unable to interact with others, only that she does not. (R. 13). Giezey has moderate difficulties in maintaining concentration, persistence and pace; however, she is able to follow simple directions, respond appropriately to changes, and make small decisions on her own. (R. 13). Finally, the ALJ opined that Giezey has not suffered any extended periods of decompensation. (R. 14). In making this determination, the ALJ relied on the fact that plaintiff has not required inpatient hospitalization since 2005 and is not currently being treated for her bipolar disorder. (R. 16). Upon review, the ALJ did not err by finding that Giezey's mental impairments did not satisfy the "paragraph B" criteria.

Giezey argues that her lack of treatment was due to financial inability to receive care and that may not be used as evidence that her condition is not severe. (Plaintiff's Brief, 8). This is a correct statement of the law. "It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help

---

[12] A "marked" restriction is measured as being more than moderate but less than extreme. (R. 13).

[13] To satisfy this condition, a claimant must have either three episodes within a year, or average one episode every four months, each period of decompensation lasting for at least two weeks. (R. 13).

him." Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984). Inability to pay for treatment is among the few good reasons for a claimant's refusal to follow prescribed treatment. Id. However, to rely on this "the claimant must show that he has exhausted all free or subsidized sources of treatment and document his financial circumstances before inability to pay will be considered good cause," for refusing treatment. Id. The only evidence offered about plaintiff's financial status was that her husband's earnings placed them over the limit for Medicaid insurance. (R. 41). Additionally, Giezey testified that she stopped seeking counseling after Colonial Psychiatric Associates refused to accept her new insurance. (R. 41). She also testified that neither she or her husband had insurance – a claim which is at odds with the extensive and varied medical record in the case. Even if Giezey lacked insurance as she claimed, she did not testify that all mental health treatment was unavailable, nor did she produce evidence of any effort to find an alternative source of mental health treatment.

While the ALJ may not rely on Giezey's refusal to get treatment she cannot afford as a justification to preclude a finding of disability. See 20 C.F.R. §§ 404.1530, 416.930. see Lovejoy v. Heckler, 790 F.2d 1114, 1117 (1986). This is not to say that the ALJ may not consider the treatment plaintiff *did* receive when determining the severity of Giezey's mental impairments.

> While a claimant's failure to obtain medical treatment she cannot afford cannot justify an inference that her condition was not as serious as she alleges, see Lovejoy, 790 F.2d at 1117, an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility.

Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994); see also Dover v. Bowen, 784 F.2d 335, 337-38 (8th Cir. 1986). This is particularly true if evidence indicates the lack of treatment is not due to financial hardship.

24

In this case, the ALJ noted inconsistencies between plaintiff's own testimony and the actual severity of her mental impairment indicated by the overall medical record. Giezey testified that her bipolar disorder manifests itself with the following symptoms: severe mood swings, quick bursts of temper, impulsive behavior, low energy, racing thoughts, changes in sleep pattern, and social withdrawal. She claimed her doctors told her she was a "ticking time bomb". (R. 15). The ALJ noted, however, that she was well-spoken and in no apparent distress during the hearing, that her daily activities were not notably limited, and that she had no difficulty obtaining medical treatment for a variety of other ailments during this same time period. (R. 17). Moreover, while Giezey testified she stopped pursuing psychotherapy because she lost insurance coverage which formerly covered it, she also stated that she did not take the prescribed medications because she was "afraid of [them]". (R. 40). In the three years between her last mental health treatment and her hearing, the medical record documents dozens of visits to the healthcare providers indicating Giezey apparently had no difficulty arranging medical care for her asthma, her shoulder, and a variety of other physical ailments.

According to Mickles, it is "not improper for the ALJ to consider the level and type of treatment [claimant] sought and obtained in determining what weight to accord her allegations..." 29 F.3d at 930. In this case, the fact that Giezey was able to access medical treatment without incident was significant in the ALJ's determination that her mental impairments were not as severe as alleged. In addition, the medical records which were submitted repeatedly reflect that her bipolar was "stable." In light of this evidence, the ALJ did not rely upon Giezey's lack of mental health treatment improperly.

To the extent Giezey contends that the ALJ erred in evaluating her credibility, the Court must give great deference to the ALJ's credibility determinations. Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997). "When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" Id. (quoting NLRB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)). The Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" Id. (quoting NLRB v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993)). Here, the ALJ accurately analyzed the medical record and articulated a number of reasons for not fully crediting Giezey's statements. There are no exceptional circumstances which would warrant disregarding the ALJ's credibility determination. Accordingly, the Court finds the ALJ properly evaluated claimant's credibility.

## V. RECOMMENDATION

For the foregoing reasons, the Court recommends that the final decision of the Commissioner be affirmed.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed

pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a _de novo_ determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, VA

August 2, 2010

27

## Clerk's Mailing Certificate

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

Blythe Ann Scott
Rutter Mills LLP
160 W. Brambleton Ave.
Norfolk, VA 23510

Robert Wayne Gillikin, II
Rutter Mills LLP
160 W. Brambleton Ave.
Norfolk, VA 23510

Virginia Lynn Van Valkenburg
United States Attorney's Office
101 W. Main St.
Suite 8000
Norfolk, VA 23510

Mark Anthony Exley
United States Attorney's Office
101 W. Main St.
Suite 8000
Norfolk, VA 23510

Fernando Galindo, Clerk

By _____
Deputy Clerk

AUG - 2 _____, 2010